**Gene CORBITT, d/b/a Corbitt Excavating Company, Plaintiff-Appellee,**

v.

**FEDERAL KEMPER INSURANCE COMPANY,
Defendant-Cross-Plaintiff-Appellant,**

**and**

**Kenneth R. Baker,
Defendant-Cross-Defendant-Appellee.**

Court of Appeals of Tennessee,
Western Section.

Nov. 7, 1980.

Certiorari Denied by Supreme Court
Feb. 19, 1980.

Allen W. Wallace, Waverly, for plaintiff-appellee, Gene Corbitt, d/b/a Corbitt Excavating Co.

Hewitt P. Tomlin, Jr., Waldrop, Hall, Tomlin & Farmer, Jackson, for defendant-cross-plaintiff-appellant, Federal Kemper Ins. Co.

Phillip G. Hollis, Peeler & Hollis, Camden, for defendant-cross-defendant-appellee, Kenneth R. Baker.

EWELL, Judge.

Gene Corbitt d/b/a Corbitt Excavating Company brought suit in the Chancery Court of Benton County, against Federal Kemper Insurance Company and Kenneth R. Baker, local agent for Kemper in Benton County, seeking recovery of $17,240.00, the value of a 1972 John Deere 450 bulldozer virtually destroyed by fire on December 23, 1976, and allegedly insured by Kemper through the Baker Agency. Kemper filed a cross-claim against Baker demanding judgment over against Baker in the amount of any judgment which might be rendered for the plaintiff against Kemper.

From the final decree awarding Corbitt judgment in the amount of $17,240.00 against Kemper only and dismissing Kemper's cross-claim against Baker, Kemper has appealed and assigned error. Corbitt did not appeal from the dismissal of his complaint against Baker.

For a number of years Corbitt operated a small excavating business under the name and style of Corbitt Excavating Company in Benton County, and since 1972 had purchased insurance through Kenneth R. Baker doing business as Kenneth Baker Insurance Agency in Camden, Tennessee. Baker was an independent agent representing Kemper, Grange Mutual Insurance Company and others, and the coverage afforded to Corbitt was placed by Baker through Grange Mutual. In the fall of 1976 Grange notified Baker that it was withdrawing from his agency and would not renew any policies written by him. The anniversary date of the Corbitt coverage written by Grange was November 26, 1976, and there was an understanding between Baker and Corbitt that Baker would secure for him continuation of coverage from and after November 26, 1976, through another company. The coverage required by Corbitt included liability coverage for his operations as an excavating contractor, commercial automobile coverage for his motor vehicles and inland marine coverage on his construction equipment including the 1972 John Deere 450 bulldozer.

Baker employed his wife, Diane, as secretary. She was a licensed insurance agent in the State of Tennessee and held a certificate of authority to represent some of the companies for which Baker was agent. However, she did not hold a certificate of authority as to Kemper. Baker had been an agent for Kemper since April 1, 1975, under a written agreement authorizing him to solicit business and issue binders in certain situations as set forth in the Agency Manual. Baker's binding authority for inland marine coverage was limited to $10,000.00, and it is undisputed that Baker did not have the authority to bind coverage on the dozer valued in excess of that amount.

In late October or early November of 1976 Baker and Diane began efforts to secure through Kemper continuing coverage for Corbitt. They were assisted in their efforts by James Robert McDonald, regional sales manager for Kemper. McDonald maintained his residence and office in McKenzie, Tennessee. The home office for Kemper was in Decatur, Illinois. McDonald served as regional supervisor in West Tennessee and maintained regular contact with the various independent agents representing Kemper. On occasions he provided assistance to the agents in the conduct of their business, but he did not participate as a producing agent in the writing of insurance.

While visiting the Baker agency in late October or early November of 1976, McDonald assisted Baker and Diane in the preparation of a "Request for Quote" concerning the Corbitt coverage. The "Request for Quote" was simply a request from the agent to the company for a rate quotation in order to determine premium cost for evaluation by the potential insured in considering whether not to make application for the coverage. This differs from an application for insurance which, in effect, is an unconditional request for coverage effective immediately upon acceptance by the company.

Since different types of coverages were involved, the request for quote consisted of several forms. The request was dated November 23, 1976 (the Thursday before Thanksgiving), and was stamped as having been received in the mail room of Kemper in Decatur, Illinois, on November 29, 1976 (the Monday following Thanksgiving).

On or about November 29, 1976, there was a telephone conversation between Baker and McDonald concerning this coverage. The written findings of the Chancellor reflect that he placed great weight on this conversation in arriving at his decision, and this emphasis by the Chancellor compels a review of all testimony in the record relating directly thereto.

At trial excerpts from the discovery deposition of Baker were read into the record. On discovery he testified as to his conversation with McDonald as follows:

### ON CROSS–EXAMINATION BY ATTORNEY FOR CORBITT

"Q. And then, as the expiration of the policy with Grange Mutual Insurance Company came closer, did you have any further conversation with Mr. McDonald?

"A. I didn't until it was approximately the day it was due. I called Bob one morning and I told him I hadn't heard anything back from Federal Kemper, and I said, 'I've got to have it covered today, and I definitely have got to have that pickup covered now.' And he said, 'All right. Let me call them.' So, then he called me back and said, 'Ken, the pickup is covered right now and the underwriter I can't think right now—

"Q. Joe Petty?

"A. Joe Petty at that time was the underwriter and he said Joe said he hadn't seen the application, but he would get it and if everything looked all right, he would bound coverage on it."

### ON DIRECT EXAMINATION BY ATTORNEY FOR KEMPER

"Q. When was your next and when I say you I mean you personally, when did you next talk to Bob McDonald or anyone else in regard to the Gene Corbitt, d/b/a Corbitt and Corbitt Excavation Insurance account?

"A. It was about November 26th or that neighborhood. That was the day or about the day that the Corbitt's insurance expired with Grange Mutual?

"Q. Right. And who did you talk to?

"A. I called Bob McDonald and I said, 'Bob, do you remember that Gene Corbitt who done that work on Corbitt and Corbitt Excavating? That's what it was.' He said, 'Yeah, I do.' And I said, 'I haven't heard anything from the company.' And I said, 'I've got to have the pickup that pickup (sic) covered right now if it's not covered.' And I said, 'I've got to have all of that other if it is not covered.' He said, 'All right. Let me call.' The best I remember Joe Petty was the underwriter there and he said, 'I'll call you back.' And he called me back and said, 'Kenneth, Joe Petty said that he did not have the file in front of him. He would bind coverage on the pickup right now. He would find the file. If it looked good, he would bind coverage on it.' So, that was the next thing I did.

"Q. And that was on or about November 26?

"A. Yes, sir.

"Q. So, then, after two conversations with McDonald, Bob McDonald you were told by him that coverage was bound on the pickup? At that time?

"A. Yes, sir. Yes, sir.

"Q. So, you knew that?

"A. Yes, sir.

"Q. But you were not told that coverage was bound on anything else correct?

"A. At that time, yes, sir."

.        .        .        .        .

At the trial Baker gave the following testimony on the same subject:

### ON DIRECT EXAMINATION BY ATTORNEY FOR BAKER

"Q. Well, now you have also, heard about or you testified yourself about the famous now dialogue of November the 29th, 1976?

"A. Uh-huh.

"Q. Will you tell the Court what took place at that time and the reason for that telephone call, if any?

"A. Well, as a rule Diane will go back or one of the secretaries like every two or three days anything that we have on what we call agency bill, which we have to bill, or people will call us and they will say, 'You go ahead and send a payment in, and you know, we'll pay you.' They go back about every two or three days to make sure these people are paying and make sure everything is covered on it, and this I don't remember—it was in that neighborhood of the 26th or it might have been the 29th. I don't know. It was in the neighborhood. Well, I seen that we had sent that in but I hadn't got it okayed on that because we had talked about we would have to call the company on it. So, I called Bob. Of course, I knowed I had binding authority as far as that pickup was concerned, but you go back it was in a package deal. So, I didn't want to have no misunderstanding whatsoever. So, I had Bob on the line. I said, 'That pickup is covered, you know.' I said, 'Now, I've got to have that pickup now because I didn't want no misunderstanding,' and I said, 'I've got to have that other equipment covered.' He said, 'Let me call Joe Petty and I'll call you back.' And then, of course, he called me back and he said, 'I talked to Joe and he said the pickup was no problem. He would find the application. If it looked good he would bind the coverage.' And with all of the companies I've ever dealt with that's all I have had to have to bind anything because I've never had to dot any I or cross any T to make sure everything was covered."

"Q. Okay. What, if anything, did Mr. McDonald report to you when he called back?

"A. He said that he talked to Joe Petty and Joe said the pickup was covered and he said he would look the application up, and if it looked good he would bind coverage on it.

"Q. And that was it?

"A. That was pretty well the extent of it, yes.

"Q. Do you recall talking to Mr. Mc-Donald on another occasion following the telephone call prior to the loss?

"A. Not right now I can't. You're talking about before besides the day that we was talking in the conference room?

"Q. Okay. I'm not talking about the date of the application.

"A. Okay.

"Q. I'm talking about the 29th of November. I'm talking about sometime between the 29th of November and the 23rd of December if you had an occasion to discuss this matter again with Mr. McDonald.

"A. Well, right now I can't recall, no."

.    .    .    .    .

McDonald, the other party to the conversation, testified at trial as follows:

### ON DIRECT EXAMINATION BY ATTORNEY FOR KEMPER

"Q. Now, when did you next have any communication with the Baker Agency about this matter?

.    .    .    .    .

"A. All right, sir. It was on 11–29th.

"Q. All right, sir. That's when you talked to Mr. Baker?

"A. Yes, sir.

"Q. Do you recall the substance of that conversation?

"A. It was in my mind that I talked to Mrs. Baker. I don't remember talking to Mr. Baker, but I received a call I remember it was in the morning, and she told me in regard to the Corbitt case that we had sent the inquiry in on that Mr. Corbitt needed his pickup covered and wanted me to call the home office and find out if they had taken any action on the quotation request, if they could go ahead and bind the pickup. So, I called Mr. Joe Petty and told him, you know, that the pickup was needed to be bound immediately and would he take a look at the file and give us permission to bind the pickup, but he—

"Q. Let me ask you. Did or did not Mr. Baker have authority to bind the pickup truck himself?

"A. Yes, sir. He had authority to bind the pickup, but we had sent in a fleet and we had to separate the pickup from the fleet.

"Q. All right. Is that what necessitated the telephone call?

"A. Yes, sir.

"Q. And what permission were you given?

"A. He was given permission to go ahead and bind or Mr. Baker and myself to bind the pickup and the file we had sent in on Mr. Corbitt that he would look at the file and find the file. It was unavailable right then, but go ahead and bind the pickup and he would look at the file and then, he would be back in touch with us as to whether he could write the entire account."

.    .    .    .    .

## ON CROSS EXAMINATION BY ATTORNEY FOR BAKER

"Q. Okay. And you admit that Kenneth Baker, you say you recall it was Diane Baker, but whoever contacted you on the 29th day of November, 1976, I presume at your office in McKenzie?

"A. Yes, sir.

"Q. And you did, in fact, call Decatur?

"A. Yes, sir.

"Q. I assume on the watts line?

"A. Yes, sir.

"Q. Of which there are no record?

"A. No, sir.

"Q. And you talked to an underwriter?

"A. Yes, sir.

"Q. Okay. Now Mr. McDonald, if Mr. Baker had the power without doing anything to bind the pickup truck, which he did, didn't he?

"A. It was in a fleet deal and he had already submitted for a quote and the reason for calling was to separate that and also, find out if anything had been done on the Corbitt file.

"Q. So, there were two reasons?

"A. He was disturbed, yes, sir.

"Q. He was disturbed?

"A. Yes, sir or he wouldn't have called me. He was concerned. I don't know where he was disturbed, but he was concerned or he wouldn't have called me.

"Q. Well, what was he concerned about, coverage?

"A. He said the pickup truck that he needed, he or Mrs. Baker or whoever was calling, needed the coverage now. He didn't want to wait any longer on it. The man had to have coverage on his pickup.

"Q. But Kenneth Baker or when you were an agent couldn't you have said: Mr. Corbitt, I'm going to bind the pickup truck and then, you could have notified the people in Decatur to drop the pickup truck from the fleet, or would that have made him ineligible for a fleet or what?

"A. I believe there's 5 vehicles and less than 5 vehicles doesn't make it eligible for a fleet. That's right. There's 5 vehicles. That would have changed the fleet status.

"Q. Okay. So, that might be a reason for that, but as far as having coverage on the pickup truck he could have bound the pickup truck on the spot? He didn't have to call you for that, did he?

"A. Not if he could submit the underwriting criteria and so forth.

"Q. Well, there's nothing to indicate that it didn't, is there?

"A. No, sir, I'm not saying it didn't.

"Q. So, then, he could have bound the pickup truck himself?

"A. Yes, sir.

"Q. Okay. That might have fouled up the fleet, but as far as having coverage he would have had coverage? He wouldn't have had to ask you or Joe Petty or anybody?

"A. No.

"Q. So, he was concerned about the rest of the risk, wasn't he?

"A. Yes, sir, I guess he was concerned about it or he wouldn't have called me. He was at least concerned about the pickup was his primary reason for calling.

"Q. Okay. Now, so, you did call Mr. Petty?

"A. Yes, sir.

"Q. And he said substantially: Yeah, go ahead and bind the pickup and if the rest of it looks okay then, we'll cover it. Okay, maybe he didn't say bind it. What did he say? We'll issue a policy, we'll issue a quote? What did he say?

"A. He told me he would take a look at the inquiry and give us a decision as to whether he could write that when he looked at it. He did go ahead and say tell Mr. Baker to bind the pickup.

"Q. Now, this is on November 29th. Now, this is the last you know about—Well, except the fact—Did you relay this back to Mr. Baker?

"A. Yes, sir.

"Q. You're not disputing that? You did?

"A. Right."

.     .     .     .     .

Following this telephone conversation the next significant development was the receipt by the Baker agency of a letter from J. R. Petty of Kemper dated December 3, 1976, as follows:

Regarding GENE CORBITT DBA
            CORBITT & CORBITT EXCA-
            VATING
            REQUEST FOR QUOTE

I am in receipt of your request for quote for automobile, inland marine, and manufacturer's and contractor's liability coverage on the above prospect. However, in order to determine the eligibility of this risk, I will need to know some additional information.

Please forward a list of drivers, to include the date of birth and drivers license number. Please advise the loss experience on the automobile and liability coverages for the last three years. Please advise if there have been any accidents or violations for any of the drivers.

Please advise who the previous carrier was and their policy number.

Upon receipt of the above requested information, I will be able to continue my work on this file.

Regards.

Baker responded to this letter by returning the original to Kemper with the following notation typed on the bottom thereof:

12–10–76

The drivers are:

Gene Corbitt DOB 10–13–35 driver License # 422708

Bill Wiseman DOB 5–16–23  ″        ″ # 3219882

both have clear driving records/

Previous carries;;; Grange Mutual policy # 0049903

If more infor needed-please advise.

Thank you, Kenneth Baker

The claims are 9–75 a comp claim for windshield in the amount of $111.00 10–75 liability on a backhoe, the equipment hit a hole and it fell against the building and did $240.00 damage 10–75 Dozer was filling in around a basement and hit the wall doing $35.00 damage. For a total on 3 years of $386.00. Not Bad!

The foregoing response was received by Kemper on December 13, 1976. There was no other development of significance until December 23, 1976, when the dozer was destroyed by fire. There had been no further contact between Kemper and Baker, and the record reflects that a decision regarding the quotation of rates was not made within the Kemper office until January 3, 1977.

The uncontradicted proof in the case is that between November 15 and December 10 Diane, as secretary of Kenneth Baker Insurance Agency, told Corbitt that (1) his policy with Grange would not be renewed, (2) they were taking steps to secure coverage with Kemper to commence upon the expiration of the Grange policy, and (3) they had a binder from Kemper assuring

coverage but had not yet received a quote on the rates. Although Corbitt did not receive a policy and paid no premium, relying on the Baker agency and representations of Diane, he assumed that he had coverage; and on December 23, immediately after the dozer burned, he went to the agency office to report the loss. On this occasion he dealt directly with Baker for the first time since notice of the decision of Grange not to renew.

Corbitt insists that he is entitled to recover the value of his dozer from Kemper and/or Baker, and he is not particularly concerned where the money comes from as is clearly demonstrated by his failure to appeal from the action of the Chancellor in dismissing his complaint as to Baker. Baker agrees that Corbitt is entitled to recover against Kemper but insists that he is not personally liable. Baker's theory is that Kemper committed to coverage in the course of his telephone conversation with McDonald on or about November 29 or, failing that, became bound to cover because of failure to advise otherwise prior to the loss on December 23. Kemper insists that it could not be liable since no application was received, no commitment was made, no policy was issued and the only representations to Corbitt were made by Diane who was not its agent. Kemper further insists that it would be entitled to judgment over against Baker for the amount of any judgment rendered against it since the entire problem arose from Baker's carelessness, negligence and breach of contract.

The Chancellor adopted Baker's theory placing responsibility solely upon Kemper by reason of the acts of its regional sales manager, McDonald, as set forth in that portion of his written findings as follows:

It appears to the Court that the crux of the litigation hinges on the activity of one Robert McDowell (sic), who is regional sales manager for defendant insurance company. The record is complete in that he not only was encouraging business for his company from the Baker Agency but with the help of Mrs. Baker filled out the application form for the coverage of plaintiff's property.

The cross-defendant, Baker, and his wife claim they made a telephone call to McDowell (sic) when the policy was delayed by the company and received an oral binding on the coverage of the plaintiff's property. McDowell (sic) denied this; however, McDowell (sic) did testify in answer to the Court's question that he did have the authority to so bind the defendant insurance company.

The Court after a careful survey of the entire record, exhibits and stipulations finds the preponderance of evidence in favor of the Bakers on this issue and the only action of Dianne (sic) Baker was not that of holding herself out as an agent but was to relay the message of the oral binder as per her instructions from Agent McDowell (sic).

.  .  .  .  .  .

On appeal Kemper insists that the Chancellor erred:

(1) In failing to grant its motion to dismiss at the conclusion of Corbitt's proof.

(2) In dismissing Corbitt's suit against Baker.

(3) In rendering judgment in favor of Corbitt against Kemper.

(4) In dismissing Kemper's cross-action against Baker.

(5) In finding that Baker received authority from Kemper to bind coverage on Corbitt's dozer.

The first, third and fifth assignments relate directly to the claim of Corbitt against Kemper. The second and fourth assignments relate directly to the claim of corbitt against Baker and the cross-claim of Kemper against Baker. For the purposes of our discussion we will address the assignments grouped accordingly.

We agree that the Chancellor erred in finding that Baker received authority from Kemper to bind coverage on Corbitt's dozer. In so holding the Chancellor relied upon the telephone conversation between Baker and McDonald. Close scrutiny of the testimony hereinabove quoted simply does not support that finding. Even if Baker had interpret-

ed the comments of McDonald as binding Kemper to coverage, such misinterpretation should have been corrected upon his receipt of the letter from Petty several days later. Further, the Chancellor's finding that McDonald testified that he did have authority to so bind the company is in direct conflict with the record in which the following exchange between the Chancellor and McDonald is recorded:

"THE COURT: Mr. McDonald, let me ask you a question. You say you reported it?

"A. Yes, sir.

"THE COURT: Now, at the time that you were called on the telephone as you have testified and as Mrs. Baker testified did you have the authority to make a (sic) oral binder on all of this property?

"A. No, sir, I didn't.

"THE COURT: All right. Now, who did have the authority?

"A. The underwriting department. I assume that Mr. Petty could have done that. He might have had to contacted (sic) somebody.

"THE COURT: Did you call Mr. Petty after they talked to you?

"A. Yes, sir.

"THE COURT: And then, did you call them back and report it?

"A. Yes, sir. Yes, sir.

"THE COURT: That's all."

We find from an overwhelming preponderance of the evidence that Kemper at no time committed itself to insure the dozer. However, Corbitt was unaware of this fact, and he acted in a reasonably prudent manner in relying upon the Baker agency to secure coverage and upon the representations of Diane to the effect that such coverage had been bound. As to Corbitt, Kemper is bound by the representations of Diane who had apparent but not actual authority to speak for Kemper. The general law in this regard is concisely stated in 44 C.J.S. Insurance Section 228 (1945) as follows:

In order that the company may be bound by a contract entered into by its agent, it is necessary and sufficient that the agent have authority, and the authority of the agent must be real or apparent, to enter into the contract or agreement; or in the absence of such authority that the contract be ratified by the company. Where his actual authority is less than his apparent authority, it is necessary, in order to bind the company, that the limitations or restrictions on his powers shall not be known to the other contracting party; but apparent authority is equal to real authority when the limitations are unknown. It is usually held that a mere soliciting agent has no power to enter into a contract of insurance, and that a general agent has such power; and any attempted restriction on the customary authority of a general agent is to be liberally construed in favor of his authority.

The Supreme Court of this State in the case of *Aetna Life Insurance Company v. Fallow*, 110 Tenn. (2 Cates) 720, 77 S.W. 937 (1903) dealt with a similar factual situation involving the same legal principles and stated at pages 732 and 733, 77 S.W. at page 940 as follows:

The authorities are numerous in support of the general proposition that an agent of an insurance company, having ostensible general authority to solicit applications and make contracts for insurance, and to receive first premiums, binds his principal by any acts or contracts within the general scope of his apparent authority, notwithstanding an actual excess of authority. (Cases cited)

The Court of Appeals sitting *en banc* in the case of *D. M. Rose & Company v. Dysart*, 8 Tenn.App. 325 (Ct.App.1928), cert. denied Sup.Ct. (1928), in an opinion by Presiding Judge Faw, quoted with approval from 2 *Joyce on Insurance* (2 Ed.), sec. 425, the following:

The authority of an agent of the assurer must depend, in a large measure, upon the authority which those dealing with him are justified from the acts or omissions of the principal in believing him to possess. The question is not so much, what powers did the agent actually pos-

sess—it is the agent's ostensible or apparent authority, that which he is held out to the world to possess, which is the test of his actual powers in the absence of knowledge of limitations thereon on the part of persons dealing with such agent. So it may be generally stated that an insurance company will not be allowed to hold out a person as its agent, and then disavow responsibility for his acts. And the tendency of the courts at the present day is toward a liberal, rather than a strict, construction of an agent's powers. The fact that the agent's appointment is by a written instrument cannot affect this rule where its terms are unknown to those dealing with him; and the rule has been extended to cover such acts of the agent as are with (sic within) the scope of such authority as the assured was justified, by the company's acts, in believing him to possess. So that an insurance company is bound by the acts of its agents within the real or apparent scope of his authority, and, to this extent, the act of the agent is that of his principal. And this is so, even though he violates limitations upon that authority which are not brought home to the knowledge of the party with whom he deals, and this applies even though the agent's acts be in direct violation of his instructions. . . . . .

The attorney for Kemper argues that the law with respect to apparent authority in an agency relationship does not apply here because the material representations relied upon by Corbitt were made by Diane and not by the agent, Baker. The record reflects that Diane did not have a "Certificate of Authority" with respect to Kemper as required by T.C.A. 56–819; and Kemper insists that in the absence of such Diane was the agent of Baker only and not the agent of Kemper. We do not agree.

It was incumbent upon Kemper, not Baker or Diane, to obtain the "Certificate of Authority" in compliance with the statutory law of this state. See T.C.A. 56–820. Throughout the record we find instances in which the representative of Kemper dealt with Diane, not Baker. While it is true that she was the agent of Baker, as between Corbitt and Kemper the facts together with the provisions of T.C.A. 56–824 dictate that she was in the legal position of being Kemper's agent. As between Kemper and Baker, Baker is responsible for her acts which were unauthorized by Kemper, but this does not relieve Kemper of liability to an innocent third person unaware of the limitations of her authority. The general principle is well stated in 44 C.J.S. Insurance 826, Section 152 (1945) as follows:

A general agent, and not the company, is responsible for acts of his subagent, which are not authorized by the company; and, where the company expressly stipulates in the agency contract that it will not be responsible for subagents, as between the agent and the company such a stipulation is binding, but it does not relieve the company of liability for the subagent's acts as to third persons who have no knowledge of the stipulation.

*Clerks and employees.* In the discharge of his general duties a regularly appointed agent may employ clerks and employees whose acts, within the scope of his authority, in carrying on the business of the agency will be binding on the company, and notice to whom will be notice to the company. On the other hand, a clerk employed in an insurance office cannot bind the company by acts which are beyond the scope of his real or apparent authority. . . . .

In the case of *Aetna v. Fallow, supra,* the Supreme Court of this State spoke to this relationship as follows:

As to the point that a subagent or clerk in the office had no authority to bind the company by collection of the premium after due, there is nothing in this. "It has been held that an ordinary agent of an insurance company has the power to employ clerks to discharge the ordinary business of his agency, and that a waiver of a character which the agent himself could make is to be attributed to him when made by his clerk. In *Bodine v. Exchange F. Ins. Co.,* 51 N.Y. 117, it was said by Earl, C., at page 123: 'We know,

according to the ordinary course of business, that insurance agents frequently have clerks to assist them, and that they could not transact their business if obliged to attend to all the details in person; and these clerks can bind their principals in any of the business which they are authorized to transact. An insurance agent can authorize his clerk to contract for risks, to deliver policies, to collect premiums, and to take payment of premium in cash or securities, and to give credit for premiums or to demand cash; and the act of the clerk in all such cases is the act of the agent, and binds the company just as effectually as if it were done by the agent in person. The maxim of "*Delagatus non potest delegare*" does not apply in such a case. Story, Ag., section 14.' Enough has been said to show that an agent of an insurance company has the right to, and indeed it is the expectation of the company that he will, employ such clerks and other assistants as may be necessary and proper in order that he may do the business for which he has been appointed agent. Upon the question of the character of the service, we think it is sufficient that the person is engaged by the agent to do for him some portion of the ordinary, usual, and well-known duties pertaining to the position of the agent, and what he does in the course of that employment and within its general scope is done by the agent." (cases cited) We think the foregoing excerpt from *Arff v. [Star Fire] Ins. Co.*, [125 N.Y. 57, 25 N.E. 1073], states the law correctly, and we adopt it as a sound statement of the rule. . . . .

See also *Tomei v. Fire & Marine Ins. Co.*, 4 Tenn.App. 268, (Ct.App.1926) and 44 C.J.S. Insurance 977, Section 232 (1945) and compare *Continental Ins. Co. v. Schulman*, 140 Tenn. 481, 205 S.W. 315 (1918) and *Epstein v. Great American Insurance Co.*, 54 Tenn.App. 447, 392 S.W.2d 331 (Ct.App. 1965).

From the foregoing it follows that while sustaining the fifth assignment of error we must overrule the first and third assignments. In other words, we find and hold

that the Chancellor was correct in finding for Corbitt against Kemper based upon the apparent authority and representations of Diane but not for the reasons set forth in his written findings.

Assignments two and four relate to the personal liability of Baker to Corbitt and/or Kemper. Since Corbitt did not appeal from the Chancellor's dismissal of his action against Baker, the second assignment raises a moot issue which we will not address further. Kemper, however, was entitled to relief under its cross-complaint against Baker and, therefore, the fourth assignment has merit.

We find and hold that the Chancellor erred in dismissing the cross-action of Kemper against Baker. Kemper did not authorize Baker to bind coverage, and the actions of Baker personally and/or through his secretary, Diane, were beyond the scope of his actual authority and in clear violation of the agency agreement and the provisions of the Agency Manual. Baker's breach of his agency agreement directly resulted in the liability of Kemper to Corbitt. In the case of *Walker v. Walker*, 52 Tenn. (5 Heiskell) 425 (1871) the Supreme Court of this State in an opinion by Justice Freeman held as follows:

It is the primary duty of an agent, whose authority is limited by instructions, to adhere faithfully to those instructions in all cases to which they ought properly to be applied. If he unnecessarily exceeds his commission or risks the property of his principal, he thereby renders himself responsible to his principal for all losses and damages which are the natural consequences of his act. And it will constitute no defense for him, that he intended the act to be a benefit to the principal. . . .

We hold, therefore, that Kemper was entitled to judgment over against Baker, and the fourth assignment of error must be sustained.

The action of the Trial Court in awarding judgment to Corbitt against Kemper is affirmed. The action of the Trial Court in

dismissing Kemper's cross-complaint against Baker is reversed, and the judgment below modified to award Kemper judgment over against Baker in the amount of the recovery of Corbitt against Kemper. The cause is remanded for collection of the judgment so modified, and the costs of appeal are assessed against the appellee, Baker.

MATHERNE and SUMMERS, JJ., concur.